# 2004 DTA 74

**TRIBUNAL DE CIRCUITO DE APELACIONES
REGION JUDICIAL I DE SAN JUAN
PANEL III**

ELPIDIO NARVAEZ VILLANUEVA Y DELIA ESTHER ORTEGA Y OTROS
Demandantes-Apelados-Apelantes

v.

LANCO MANUFACTURING CORP.; ROYAL SUNALLIANCE INSURANCE (P.R.), INC.
Demandados-Apelantes-Apelados

Núms. Cons. KLAN-02-00943 / KLAN-02-00948

San Juan, Puerto Rico, a 9 de marzo de 2004

Panel integrado por su Presidente, el Juez Antonio J. Negroni Cintrón,
y los Jueces Jorge Segarra Olivero y Charles Cordero

Negroni Cintrón, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

Elpidio Narváez Villanueva, Delia Esther Ortega, la Sociedad de Gananciales compuesta por ambos, Ileana Narváez Ortega, Carlos J. Narváez Ortega y Fernando Narváez Santiago (los demandantes), acuden a este Tribunal para que aumentemos las indemnizaciones por daños y perjuicios que a Lanco Manufacturing, Co. (Lanco), y Royal & Sunalliance Insurance, Inc. (los demandados), el Tribunal de Primera Instancia, Sala Superior de San Juan, condenó a pagarles.

A su vez, los demandados instaron separadamente otro recurso de apelación para que revoquemos la sentencia que los condenó a compensar a los demandantes.

Estudiados los alegatos presentados por las partes, la transcripción de la evidencia y los documentos que obran en autos, procedemos a considerar ambos recursos para efectos de su disposición, no sin antes exponer el trasfondo fáctico correspondiente.

### I

El 28 de marzo de 1994 los demandantes presentaron una demanda sobre daños y perjuicios contra Lanco, John Doe y Richard Roe. Alegaron que el 2 de abril de 1993, el codemandante, Elpidio Narváez Villanueva (Narváez), sufrió un accidente al volcarse un furgón, debido a que Lanco había cargado el referido furgón de forma negligente y descuidada. Señalaron que Narváez sufrió múltiples daños y perjuicios que valoraron en un millón de dólares; que la codemandante, Delia Esther Ortega, esposa de Narváez, sufrió intensas angustias mentales que estimaron en $200,000.00, y que cada uno de los tres hijos de Narváez sufrió intensas angustias mentales y morales que valoraron en $100,000.00 para cada uno.

El 11 de mayo de 1994, compareció el Administrador del Fondo del Seguro del Estado (Fondo) para plantear que la demanda presentada por Narváez era prematura, ya que éste estaba recibiendo tratamiento médico y el Fondo no había notificado todavía una decisión final. Solicitó del tribunal apelado que le permitiera intervenir en el pleito y que dictara una orden paralizando los procedimientos hasta que el Fondo notificara una decisión final y firme en cuanto a Narváez.

El tribunal *a quo* accedió a la solicitud, pero se reservó la jurisdicción para, a solicitud de parte interesada, decretar la reapertura del caso dentro de un término de sesenta días, a partir de la fecha en que adviniera final y firme la determinación final del Fondo.

Emitida la decisión final del Fondo, los demandantes le solicitaron al tribunal apelado que continuara con los procedimientos que aún estaban pendientes ante el referido foro. Posteriormente y luego de que el tribunal *a quo* acogiera la referida moción de reapertura, el Fondo presentó una demanda de subrogación y solicitó del tribunal apelado que reservara de la sentencia que en su día pudiera emitir en favor de Narváez, la cantidad de $32,104.80 por concepto de los gastos en los cuales incurrió el Fondo en el tratamiento de éste.

El 8 de mayo de 1995, Lanco contestó la demanda y la demanda de intervención presentada por el Fondo y negó todas y cada una de las alegaciones esgrimidas por los demandantes y por el Fondo. No obstante, las partes estipularon la suma a la cual ascendió el tratamiento médico de Narváez, por lo que el tribunal *a quo* dictó sentencia parcial de conformidad con la Regla 43.5 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, y adjudicó que los gastos del Fondo ascendían a $25,683.84.

Así las cosas y luego de los trámites procesales acostumbrados, se celebró el juicio en su fondo del caso los

días 5 de septiembre de 2000, 22 y 23 de febrero de 2001, y 5 y 7 de marzo de 2001. Durante el último día y mientras las partes culminaban la presentación de la prueba oral, pericial y documental, se suscitó una controversia en torno a si era admisible la deposición que los demandados le habían tomado a un testigo suyo, el marinero Ronald Hale en sustitución de su testimonio en sala. En vista de ello, el tribunal apelado le ordenó a las partes que presentaran memoranda de derecho en apoyo a sus respectivas posiciones y aclaró que resolvería el asunto en la sentencia que dictara en su día.

Cumpliendo con la orden anterior, los demandados presentaron una solicitud para que se aceptara la deposición tomada a Ronald Hale en sustitución de su testimonio. En la misma expresaron que Ronald Hale, quien fue testigo ocular de los hechos, no estaba disponible porque residía en el estado de Mississippi y no podía ser compelido mediante citación a comparecer a la vista. Citaron la Regla 29.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, y aseveraron que bajo el inciso (c) de la misma sólo se exige que el testigo no esté disponible por alguno de los motivos que ofrece la regla para que así proceda la admisión de una deposición que se le haya tomado a éste. Señalaron que realizaron gestiones para que el testigo compareciera a juicio, pero que mediante teléfono, éste le manifestó que se le hacía difícil y oneroso viajar y comparecer a la vista.

Los demandantes se opusieron a que la deposición de Ronald Hale fuera admitida en evidencia porque aunque era correcto que los demandados tomaron la deposición a Hale con el propósito de perpetuar su testimonio, los mismos no acreditaron con prueba fehaciente las gestiones que hicieron para asegurar la comparecencia de dicho testigo ni sometieron evidencia de correspondencia con dicha persona o de las excusas mencionadas para éste no venir a Puerto Rico. Indicaron, además, que con independencia de lo anterior, y en caso de que el tribunal admitiera en evidencia la deposición en cuestión, quedaría por resolver la objeción que levantaron durante la deposición de Ronald Hale a los efectos de que el testimonio de éste en cuanto a las causas del accidente era inadmisible porque se trataba de opinión pericial para lo cual el testigo no estaba calificado.

Los demandados replicaron a la oposición de los demandantes. Señalaron que las gestiones que hicieron para traer a Ronald Hale las hicieron por teléfono y que estaban dispuestos a someter copia de la factura telefónica para acreditar las llamadas que se le hicieron al referido declarante. En cuanto al segundo planteamiento de los demandantes, sostuvieron que Ronald Hale sólo indicó que *"en su opinión, el vehículo iba rápido"*, y que es un principio elemental de evidencia, que un testigo lego puede dar una opinión en cuanto a la velocidad a la que viaja un vehículo.

El 1 de junio de 2002, el tribunal apelado emitió la sentencia de la cual se apela. En la misma, formuló las siguientes determinaciones de hechos:

*"Para el 2 de abril de 1993, el Sr. Elpidio Narváez (en adelante Narváez) tenía 56 años de edad, estaba casado con la Sra. Delia Esther Ortega y tenía varios hijos llamados Ileana y Carlos Narváez Ortega, así como Fernando Narváez Santiago.*

*Lanco Manufacturing Corp. (en adelante LANCO) es una entidad manufacturera que se dedica a la producción de pinturas, pegas y otros productos relacionados, con oficina principal en la Urbanización Aponte, Lote 5 de San Lorenzo, Puerto Rico. Para las fechas envueltas en el caso, Lanco estaba asegurada con Royal Insurance Company para riesgos como los envueltos en este litigio. No se establecieron los límites de dicha póliza.*

*Para la fecha de los hechos, Narváez era empleado de la compañía International Shipping Agency, Inc., en la cual laboraba por espacio de 12 años. Se desempeñaba como conductor de camiones de arrastre, también conocidos como caculos, mulas o "yard hustlers", con los cuales se arrastraban furgones en el muelle de San Juan. Dichos camiones o tractores son más pequeños que los que transportan furgones por las carreteras de Puerto Rico.*

*En esas labores ganaba $21.50 por hora y tiempo y medio en horas extra y días feriados. El señor Narváez tenía vasta experiencia en dichas operaciones y antes del 2 de abril de 1993, nunca había tenido accidente alguno al realizar las mismas.*

*El área donde ocurrió el accidente es amplia, de superficie plana y no existe ningún desnivel u hoyo que haya podido contribuir a la ocurrencia del accidente.*

*Durante la mañana del 2 de abril de 1993, Narváez movió aproximadamente 50 ó 60 furgones sin problema o novedad de clase alguna. Para colocar o estacionar los furgones en los sitios que correspondan, muchas veces los choferes tienen que hacer la operación del "7", que es poniendo el caculo o tractor en forma perpendicular al furgón para así llevarlo al sitio específico deseado. Durante sus años de trabajo con International Shipping, el señor Narváez había realizado dicha operación en miles de ocasiones sin accidente o vuelco alguno.*

*Después de almuerzo del día 2 de abril, Narváez fue a buscar, en al área del muelle donde se colocan los furgones, un furgón o contenedor con etiqueta roja, que significa que está cargado, y lo pegó a su tractor o caculo para moverlo hacia la plataforma cercana a la barcaza en la cual el furgón iba a ser cargado. El furgón era el de los productos de LANCO. Se trasladó con el furgón y cuando seleccionó el espacio apropiado para estacionar el furgón, se detuvo y comenzó a dar marcha atrás, haciendo la maniobra del "7".*

*Cuando estaba en el proceso de hacer la maniobra, sintió un ruido que provenía del furgón y, casi de inmediato, éste se volcó completamente, llevándose también el chasis y el tractor donde estaba colocado Narváez como chofer."*

En el furgón que estuvo envuelto en el accidente, LANCO había colocado 64 drones sobre 16 paletas, 360 pailas sobre 10 paletas y 174 cajas en 5 paletas. Los drones de 55 galones estaban puestos sobre paletas de madera en el piso del furgón. Luego se acomodaron las pailas de 5 galones sobre la primera cama de drones, luego las cajas con envase de un galón, y las paletas de envases de 5 galones. El peso total de los drones y pailas colocados dentro del furgón era de 50,692 libras.

Las pailas estaban amarradas entre sí con un fleje plástico, pero no se encontraban amarradas a las paletas ni a ningún otro sitio dentro del furgón. Los drones no estaban amarrados.

Al abrirse el furgón después del accidente se encontró que la carga estaba completamente desplazada, con insuficiente riostraje. La ocurrencia del accidente fue el desplazamiento de la carga, provocando el vuelco del furgón, el chasis y el tractor.

Al examinar las fotografías disponibles del furgón después del accidente y las cuales se admitieron en evidencia, el Ing. Garrett las describe en su informe de la siguiente forma:

*"Se observa riostraje consistente de dos (2) piezas de madera, las cuales cruzan entre las paletas de pailas y los drones recostados contra el costado del furgón. Este riostraje se instaló con la intención de evitar el desplazamiento de las paletas de pailas en dirección hacia la puerta. No impedía el movimiento de las paletas de drones colocados en el piso.*

*A partir del riostraje, en dirección al interior del furgón, se encuentra el 92% de la carga del furgón (ver análisis de la distribución de carga).*

En los doce pies más cercanos a la puerta, el espacio estaba prácticamente vacío. Se observan dos paletas, varias cajas, y aproximadamente ocho (8) drones aglomerados contra la pared. No se observa que se emplease riostraje ni mecanismo de restricción alguno, tal como maderos fijos o algún tipo de material de relleno para

restringir el movimiento de las paletas, o de la carga sobre las paletas, en esta porción del furgón.

En dicho espacio de doce pies más cercanos a la puerta del furgón no se observa ningún tipo de amarre, bien sea fleje, *"shrink wrap"* o envoltura plástica alrededor de los drones que se observan debajo de las pailas y/o recostados contra el costado del furgón.

La estiba de pailas que se observa sobre la cama de drones, en dicho especio de doce pies más cercano a la puerta del furgón, está desplazada de su propia paleta más de la mitad del ancho de la paleta. Las pailas están envueltas en plástico, pero la envoltura de plástico no amarra la estiba con la paleta haciendo que las pailas no queden amarradas a la paleta y que puedan, por lo tanto, desplazarse independientemente de la paleta. Esta condición facilita que se corra esta carga contribuyendo al, o causando el, vuelco.

Al fondo del furgón se observan dos (2) estibas de cajas con una separación de la pared mucho menos que la separación que se observa de las pailas desplazadas en la misma dirección. Las pailas disponían de mucho más espacio libre entre ellas que las cajas.

Se desprende de las fotos admitidas que muestran la parte exterior del techo del furgón, que los impactos más fuertes se produjeron de la parte central hacia el frente del furgón.

A tenor con su investigación y hallazgos, el Ing. Garrett (perito de la parte demandante) llega a las siguientes conclusiones, que le merecen entero crédito al Tribunal:

*"1) Del informe del arqueador marítimo se concluye que el furgón se volcó junto con el chasis, arrastrando consigo a la mula.*

*2) De las fotografías se concluye que el batey en el cual ocurrió el vuelco es plano.*

*3) De las fotografías se concluye que, si bien hubo un intento de riostrar la carga con maderos, ello ocurrió para con parte de la carga. Toda la carga que quedó bajo el riostraje y entre el riostraje y la puerta del furgón quedó sin mecanismo de clase alguna que impidiese su desplazamiento.*

*4) De las fotografías se concluye también que las pailas, tanto las que estaban en el volumen riostrando como las que estaban fuera, estaban recubiertas de "shrink wrap", pero que no estaban amarradas a las paletas y podían, por lo tanto, desplazarse independientemente de sus respectivas paletas.*

*5) De las fotografías se concluye también que los drones y las cajas de latas de pintura que se colocaron entre el riostraje y la puerta del furgón no estaban amarrados a sus respectivas paletas.*

*6) Debido a todo lo anterior, la carga se desplazó, causando el vuelco.*

*7) Si la carga no se hubiese desplazado, el vuelco no hubiese ocurrido.*

*8) Si la carga hubiese estado adecuadamente riostrada y marrada, la carga no se hubiese desplazado como lo hizo, causando el vuelco.*

*9) Si la carga no se hubiese desplazado, la combinación furgón / chasis hubiese tenido que virarse a 21 grados de la vertical, en su eje longitudinal, para que ocurriese el vuelco, cosa imposible, dado lo llano del batey en el cual ocurrió el vuelco.*

*10) El accidente (vuelco) lo causó el desplazamiento de la carga mal localizada e inadecuadamente*

*riostrada."*

Como consecuencia del accidente, Narváez sufrió múltiples lesiones y fracturas, perdió el conocimiento y fue llevado en ambulancia al Hospital Industrial, donde estuvo hospitalizado hasta el 30 de abril de 1993. Durante los primeros 16 días estuvo recluido en la Unidad de Cuidado Intensivo, tuvo que recibir transfusiones de sangre y ser sometido a un procedimiento quirúrgico por retención urinaria. Después de ser dado de alta el 30 de abril de 1993, siguió terapia ambulatoria y convaleciendo en su casa hasta el 8 de diciembre de 1993.

En resumen, según el informe del la Dra. Luz Torres Romero, el testimonio del Dr. Jorge E. Rodríguez Wilson, del Dr. José Raúl Ortiz Rubio, la decisión del Fondo del Seguro del Estado y el récord del Hospital Industrial, Narváez sufrió múltiples golpes y contusiones, así como dos heridas profundas y extensas en la región frontal, que han dejado una cicatriz visible en toda el área y las siguientes fracturas:

*"a) fractura conminuta de la cadera en el acetábulo izquierdo;*

*b) fractura del tercio distal de la tibia y peroné de su pierna izquierda.*

*c) fractura de la rodilla y el tobillo de la pierna izquierda;*

*d) fractura de la meseta tibial de la pierna derecha;*

*e) fractura conminuta e impactada de la cabeza del húmero en el hombro izquierdo.*

*f) fractura de la rodilla derecha;*

*g) fractura del tercio distal del radio izquierdo y procesos estiloides de la urna izquierda;*

*h) fractura de la clavícula izquierda;*

*i) fractura de la muñeca izquierda."*

En adición, tuvo golpes y contusiones en diversas partes del cuerpo.

Durante su hospitalización sufrió cuatro operaciones los días 3, 7, 12 y 13 de abril de 1993. Se hizo reconstrucción del acetabulum izquierdo con reducción abierta y fijación interna de las fracturas con placas y tornillos de carácter permanente. Estuvo en tracción de su pierna izquierda por once días. En el resumen de alta del Hospital Industrial, se indica que hay limitación en los movimientos de la cadera, con dolor, y acortamiento de la pierna izquierda, para lo cual tiene que usar un zapato especial con el fin de corregir en algo el acortamiento. En las dos rodillas hay limitación para la flexión. Se operó para corregir las fracturas de ambas piernas. En el hombre izquierdo se hizo cirugía reconstructiva con injerto óseo. Los movimientos del hombro de abducción, flexión y elevación están limitados. En la muñeca izquierda hay deformidad en el dorso, y la dorsiflexión y flexión palmar están limitadas.

El Fondo del Seguro del Estado le adjudicó una incapacidad del 50% de su pierna izquierda por desarticulación a nivel de la articulación coxo-femoral, 25% de incapacidad de la pierna derecha y el 50% de incapacidad del brazo izquierdo. El Dr. Juan Llompart, perito de la parte demandada, estimó en su informe una incapacidad de 31% de sus funciones fisiológicas generales y, según el Fondo del Seguro de Estado y el perito médico del demandante, tal incapacidad resultante es de 50%, lo cual adoptamos como correcto. Narváez no puede correr, hacer deportes y camina con dificultad. Desarrolló artritis post-traumática que le produce constantes dolores en todo el cuerpo, y no pudo trabajar hasta el año 1995; desde entonces lo realiza solamente en forma

parcial, aunque percibe los mismos ingresos que antes de sufrir el accidente.

En total, recibió más de 100 sesiones de terapia para intentar rehabilitar en alguna medida sus extremidades. Inicialmente tenía que usar un sillón de ruedas, luego para diciembre de 1993, pudo caminar con un andador, después con muletas y finalmente con bastón.

Tanto en su hospitalización y operaciones, como en las múltiples terapias recibidas, Narváez sufrió constantes y severos dolores y molestias para lo cual le administraron fuertes medicamentos. Sus limitaciones físicas resultantes y la artritis post-traumática resultante también le producen y le seguirán produciendo dolores el resto de su vida. Sus severas y numerosas lesiones y fracturas, su prolongada hospitalización, sus operaciones, sus mas de 100 sesiones de terapia y su incapacidad resultante, le han producidos profundas angustias mentales y depresión.

El Sr. Narváez ha quedado con una seria incapacidad que le limita su potencial de generar ingresos. Ver *Cintrón Adorno* v. *Gómez*, **99 J.T.S. 20**; *Rodríguez Cancel* v. *A.E.E.*, 116 D.P.R. 443 (1985).

Narváez fue incapacitado totalmente por el seguro social. Luego del accidente recibía como beneficio del seguro social $530.00, lo que luego aumentó a $670.00 que aún recibe mensualmente. No obstante, no lo ha informado al seguro social, tampoco ha devuelto ningún cheque de los beneficios que recibe del seguro social. Desempeña el mismo trabajo y realiza las mismas funciones que antes del accidente, pero Narváez no pertenece a la unión y trabaja como contratista independiente.

Como consecuencias de sus lesiones, el Sr. Narváez no pudo trabajar desde el 2 de abril de 1993 hasta noviembre de 1995, dejando totalmente de producir ingresos durante ese período de dos años y medio. El ganaba $21.50 la hora. Después del 1995 comenzó a trabajar, aunque parcialmente devengando actualmente lo mismo que antes del accidente.

La codemandante Delia Esther Ortega, esposa de Elpidio Narváez, lleva 28 años casada con él y han tenido dos hijos en el matrimonio. Se enteró del accidente por una llamada recibida en su casa, lo cual le produjo una severa conmoción de gritos y llantos. Acudió de inmediato al hospital y de ahí en adelante siguió visitando a su esposo en el hospital diariamente durante toda su hospitalización y luego lo cuidaba en el hogar y lo acompañaba en sus más de 100 terapias de rehabilitación. Cuando lo vio en el hospital por primera vez lo encontró completamente desfigurado e hinchado y en una condición lamentable. Ella entró en una depresión como consecuencia de las severas lesiones de su esposo y tuvo que someterse a tratamiento con antidepresivos, tales como Prozac. También tuvieron que duplicarle los medicamentos para la presión arterial, que se le subió considerablemente con este incidente.

Cuando su esposo finalmente fue dado de alta, ella lo atendía en la casa y la habitación de éste se convirtió en una especie de hospital, ya que tenía una grúa para levantarlo de la cama y poderlo poner en la silla de ruedas. Todas sus necesidades fisiológicas las hacía en la cama y ella era quien lo limpiaba y bañaba. El se quejaba de sus dolores constantemente y dormía muy mal. Después de un tiempo, comenzó a caminar con un andador por espacio de un mes y luego con muletas. No fue hasta el 1995 en que él pudo salir de la casa por cuenta propia. Desde el accidente no han podido volver a tener relaciones sexuales, ni tener las actividades sociales y recreativas que tenían antes, tales como ir a la playa o a fiestas.

Fernando Narváez Santiago es el hijo mayor de don Elpidio y estuvo en el área del accidente. De hecho, ayudó a sacarlo del camión donde estaba en una posición rara. Al ver a su padre destrozado, el se descontroló de los nervios, gritaba y no quería que lo tocaran. Estaba completamente desesperado y acompañó a su padre en la ambulancia hasta el hospital. Al principio iba diariamente al hospital a verlo y luego lo visitaba semanalmente. Con motivo de todo este incidente, él ha tenido profundos sufrimientos y angustias mentales y morales por las

lesiones de su padre.

Ileana Narváez, de 27 años, tenía 20 años para la fecha del accidente y vivía con sus padres. Igual que su madre, se enteró del accidente y lo vio en el hospital. Se sintió grandemente impresionada al ver a su padre en las condiciones que estaba y estuvo deprimida por mucho tiempo. Lo veía todos los días en el hospital y luego en su casa y sufrió mucho por la condición, dolores y tratamiento de su padre.

Carlos Javier Narváez tenía 17 años a la fecha del accidente y vivía con sus padres. Igual que su hermana, quedó sumamente impresionado por las lesiones sufridas por su padre, con quien tenía una relación muy estrecha, lo visitaba con frecuencia en el hospital y sufrió intensamente por todos estos eventos.

Con base en las anteriores determinaciones de hechos, el tribunal apelado determinó que los empleados y funcionarios de Lanco incurrieron en negligencia al acomodar o estibar la carga en el furgón; que éstos no tomaron las medidas de seguridad necesarias para evitar que la carga se desplazara y provocara el vuelco del furgón y que ello fue la causa exclusiva del referido accidente. En consecuencia, estimó la demanda y condenó a los demandados a pagarle a los demandantes las siguientes sumas de dinero:

"Al codemandante Narváez, la suma de $70,000.00, por las fracturas, golpes, heridas, contusiones, hospitalización, cuatro operaciones, complicaciones médicas, dolores y angustias durante esos tratamientos; $40,000.00 por todos los dolores e inconvenientes durante su terapia en exceso de cien sesiones, su convalecencia en sillas de ruedas, su reclusión prolongada en el hogar, donde tenía que hacer sus necesidades en la cama, su uso de andador, muletas y luego bastón; y $30,000.00 por su incapacidad física resultante de las lesiones recibidas, su inhabilidad de llevar a cabo actividades físicas normales que antes realizaba y sus angustias morales por esa condición.

A la esposa de éste, Delia Esther Ortega, le concedió la suma de $15,000.00 por las profundas angustias mentales y morales, depresión y los trabajos que realizó para cuidar y atender a su esposo durante toda la convalecencia. A la Sociedad de Gananciales compuestas por los esposos Narváez y Ortega, le concedió la suma de $119,253.00 por la pérdida total de ingresos desde el 2 de abril de 1993 a noviembre de 1995. A cada uno de los hijos de Narváez le concedió la suma de $5,000.00 por los sufrimientos, angustias mentales y depresión que éstos experimentaron a raíz del accidente de su padre.

Finalmente condenó a Lanco a satisfacerle al Fondo la suma de $25,683.84 de conformidad con la sentencia parcial de 10 de abril de 2000, y le impuso a los demandados el pago de las costas, gastos e intereses y $1,000.00 por concepto de honorarios de abogado."

Inconformes, el 24 de julio de 2002, los demandantes presentaron un recurso de apelación ante este Tribunal. Sin embargo, y como los demandados habían presentado una oportuna moción sobre determinaciones adicionales de hechos, determinamos que carecíamos de jurisdicción y ordenamos la desestimación del recurso por haber sido presentado prematuramente.

El tribunal a quo denegó la moción sobre determinaciones adicionales de hechos y una moción solicitando vista para argumentación oral. Denegó, además, una moción de reconsideración que no fue acogida por el tribunal apelado dentro del término de 10 días que establece la Regla 47 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III.

Oportunamente, los demandantes presentaron el presente recurso de apelación impugnando las indemnizaciones concedidas por el tribunal apelado. Sostienen que en la valoración de los daños se debe utilizar el valor que el Tribunal Supremo de Puerto Rico ha considerado como adecuado en casos similares. A esos efectos citaron los casos de *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996); *Defendini Collazo v. E.L.*

*A.,* 134 D.P.R. 28 (1993); *Rodríguez Cancel v. Autoridad de Energía Eléctrica,* 116 D.P.R. 443 (1985), para sostener que en los referidos casos, el Tribunal Supremo de Puerto Rico ha otorgado una indemnización mayor a la que les otorgó el tribunal apelado, por daños inferiores o similares a los sufridos por los demandantes en el caso de autos. Aseveran que dado que Narváez sufrió innumerables fracturas, heridas y lesiones, cuatro operaciones, una prolongada hospitalización, reclusión en su hogar por un período de 8 meses, innumerables y dolorosas terapias, la incapacidad resultante, y severos daños emocionales, debe modificarse y aumentar la suma que le fue otorgada. Finalmente, sostienen que la magnitud de los daños que sufrieron el resto de los demandantes debe movernos a aumentar la cuantía de dinero que se les concedió como indemnización por los daños sufridos.

Por su parte, y en el recurso de apelación que presentaron, los demandados sostienen que el tribunal apelado erró al determinar que el vuelco del furgón se debió a que la carga se desplazó; al excluir el testimonio que brindó el testigo Ronald Hale durante una deposición y al determinar que fueron temerarios.

Aseveran que las conclusiones de hechos a las que llegó el tribunal *a quo* no representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia y que las mismas contravienen el orden natural de las cosas y *"el orden racional de la inteligencia humana"*. Indican que aunque presentaron abundante prueba para demostrar la forma en la que fue estibada la carga, el tribunal apelado ignoró completamente la misma y descansó en su lugar en una opinión pericial que ni siquiera tomó en consideración la forma y el orden en que fue distribuida la carga dentro del furgón, a saber, la del ingeniero Carlos Garrett. Expresan, además, que las fotos a las que hizo referencia el tribunal apelado sólo representan una parte de todas las que tomó el perito Pasquale Catanzaro y que éstas no demuestran cómo quedó la carga inmediatamente después del vuelco.

Aseveran que quedó demostrado que Lanco tomó medidas razonables para evitar cualquier posible desplazamiento, pues colocó suficiente riostraje entre la carga, amarró con fejes plásticos todos los drones, cajas y paletas, y envolvió con plástico las cajas y las pailas de pinturas. Expresan, además, que la prueba demostró que no existía espacio lateral alguno que permitiera que la carga se desplazara a los lados o costados del furgón; que el chasis no sufrió vuelco alguno y, por tanto, que el furgón no estaba anclado al chasis; y que sólo puede concluirse que el vuelco del furgón ocurrió porque Narváez realizó un viraje a la izquierda mientras iba a exceso de velocidad.

En cuanto al segundo señalamiento de error, sostienen que desde el inicio del pleito levantaron como defensa que Narváez Villanueva era quien tenía el control absoluto del vehículo que arrastraba el furgón y que por su negligencia había ocurrido el vuelco. Señalan que para probar su teoría solicitaron perpetuar el testimonio del testigo Hale relacionado con la forma como ocurrió el accidente, y que aunque el referido marinero compareció al señalamiento de la vista en su fondo, no pudo prestar su testimonio porque el juicio fue reseñalado en innumerables ocasiones y porque, pese a las gestiones que realizaron, no pudieron volverlo a traer a Puerto Rico. Por las anteriores razones, alegan que procede la admisión en evidencia de la deposición.

Por otro lado y en cuanto a la naturaleza de lo declarado por Hale, sostienen que como testigo lego, éste podía brindar una opinión en cuanto a la velocidad a la que Narváez conducía la mula. Finalmente, y en cuanto al último señalamiento de error, los demandados alegan que no fueron en momento alguno temerarios porque siempre existió una controversia real y sustancial en torno a las causas del accidente y porque, habida cuenta que el accidente ocurrió cuando Narváez tenía el control exclusivo y el dominio total del equipo que manejaba en esa ocasión, no era irrazonable que se defendieran.

Por su parte, los demandantes sostienen que los demandados se equivocan al basar su señalamiento de error en la versión que brindó el Marinero Hale, porque la referida deposición no fue aceptada en evidencia y porque, en la alternativa, el tribunal apelado dispuso que aun considerándola, no cree la versión ofrecida. Exponen que la deposición no era admisible porque los demandados no acreditaron las gestiones que realizaron para traer al Marinero Hale a nuestra jurisdicción y porque la misma no aportaba prueba confiable, ya que sólo contenía

expresiones especulativas y de opinión. Aseveran que la opinión del perito de los demandados en cuanto a qué causó el vuelco, sólo tomó en consideración la versión que brindó el marinero Hale y no la del codemandante Narváez. Expresan que el único testigo que contradice la versión del Narváez lo es el marinero Hale y que al excluir el referido testimonio, los demandados quedaron sin prueba para demostrar que los hechos ocurrieron como sostienen.

Aseveran, además, que en cuanto a la forma en la que estaba la carga, varios testigos, entre los que se encuentran algunos de los presentados por los demandados, admitieron que había espacios vacíos dentro del furgón y que la carga podía desplazarse. Alegan que presentaron el testimonio del Ingeniero Garrett y el del Sr. Román y que éstos explicaron que el accidente se debió a que la carga estaba mal colocada, sin una buena protección, sin el riostraje necesario y que esto permitió su desplazamiento.

Finalmente y en cuanto al tercer señalamiento de error, señalan que contra la abundante prueba de la falta de riostraje y otras medidas de seguridad para evitar el desplazamiento de la carga, la parte demandada sólo tenía el testimonio impreciso y especulativo del marinero Ronald Hale. Indican que éste se encontraba en una barcaza cuando ocurrió el accidente; que no vino a declarar el día del juicio; que los demandados debieron haber admitido su responsabilidad al contestar la demanda o, al menos, al terminar la investigación y comprobar la realidad de los hechos y que, por no hacerlo, obligaron a los demandantes a litigar, ardua y extensamente por espacio de ochos años.

Habiendo consolidado ambos recursos y comparecido todas las partes, resolvemos.

Con el fin de que se entienda mejor nuestra decisión, en primer lugar, atenderemos los planteamientos formulados por los demandados y finalmente los de los demandantes.

## II
### A. Si erró el tribunal de instancia al no admitir la deposición tomada al marinero Ronald Hale

La Regla 29.1 de las de Procedimiento Civil, *supra*, señala lo siguiente:

*"En el juicio, o al celebrarse la vista de una moción o de un procedimiento interlocutorio, la totalidad o cualquier parte de una deposición, en cuanto sea admisible de acuerdo con las Reglas de Evidencia, aplicadas como si el deponente estuviera testificando en corte, podrá utilizarse contra cualquier parte que hubiere estado presente o representada en la toma de la deposición, o que hubiere sido debidamente notificada de dicho acto, de acuerdo con cualquiera de las siguientes disposiciones:*

*(a)*

*(b)*

*(c) La deposición de un testigo, ya fuere o no parte, podrá utilizarse por cualquiera de las partes para cualquier propósito si el tribunal determina:*

*(1) Que el testigo ha fallecido; o*

*(2) que se ha demostrado que sería oneroso requerir la presencia en el juicio de un testigo que se encuentra fuera de Puerto Rico, a menos que se probare que la ausencia del testigo fue motivada por la parte que ofrece la deposición; o*

*(3) que el testigo no puede comparecer a declarar por razón de su avanzada edad, enfermedad o incapacidad*

*física; o*

*(4) que la parte que ofrece la deposición no ha podido conseguir la comparecencia del testigo mediante citación; o*

*(5) mediante solicitud y notificación demostrativas de que existen circunstancias de tal forma excepcionales, que hacen deseable en interés de la justicia y dando la debida consideración a la importancia de presentar oralmente el testimonio de los deponentes en corte abierta, que se permita el uso de la deposición."* (Enfasis nuestro)

Por otra parte, la Regla 64 de las de Evidencia, 32 L.P.R.A. Ap. IV, establece en cuanto a la no disponibilidad de un testigo lo que se transcribe a continuación:

*"(A) Definición.—Incluye situaciones en que el declarante:*

*(1) Está exento o impedido de declarar por razón de un privilegio reconocido en esta regla en relación al asunto u objeto de su declaración, o*

*(2) insiste en no declarar a pesar de orden del tribunal para que declare, o*

*(3) testifica no recordar, o*

*(4) ha fallecido o está imposibilitado de comparecer a declarar por razón de enfermedad o impedimento mental o físico, o*

*(5) está ausente de la vista y el proponente de su declaración ha desplegado diligencia para conseguir su comparecencia mediante citación del tribunal.*

*No se entenderá que un declarante no está disponible como testigo si la alegada razón de la no disponibilidad ha sido motivada por la gestión o conducta del proponente de la declaración con el propósito de evitar que el declarante comparezca o declare.*

*(B) Cuando el declarante no está disponible como testigo, es admisible como excepción a la regla de prueba de referencia:*

*(1) Testimonio anterior. – Un testimonio dado como testigo en otra vista o una deposición tomada conforme a derecho del mismo u otro procedimiento, si es ofrecido contra una persona que en la ocasión en la que se hizo la declaración ofreció la misma para su beneficio o tuvo la oportunidad de contrainterrogar al declarante con un interés y motivo similar al que tiene en la vista."* (Enfasis nuestro)

Finalmente y de acuerdo con el Profesor Chiesa en su Tratado de Derecho Probatorio, sec. 8.5 (1998), la Regla 64 (A) (5) de las de Evidencia de Puerto Rico debe tener el mismo alcance que la Regla 804 (a)(5) de las de Evidencia Federal, aunque el lenguaje de la misma varíe de aquél que emplea la regla federal. ■ En este sentido, debe entenderse que aunque la determinación de si fueron razonables o no las medidas tomadas por el proponente para lograr la comparecencia del declarante depende en buena medida de la posibilidad de diligenciar una citación (supoena), el proponente debe tratar de lograr la comparecencia del declarante por cualquier medio razonable, aunque no sea posible lograr la referida citación.

En el caso de autos, los demandados sostienen que la deposición que le tomaron al marinero Ronald Hale es admisible en evidencia porque éste vive en el estado de Mississippi, Estados Unidos, y porque los tribunales de

Puerto Rico carecen de jurisdicción para obligarlo a comparecer mediante citación. No les asiste la razón.

Una lectura cuidadosa de la Regla 29.1 de las de Procedimiento Civil, *supra*, revela que la parte que pretende utilizar la deposición para sustituir la declaración en el juicio de una persona que se encuentra fuera de Puerto Rico, debe cumplir con tres (3) requisitos, a saber: 1) que la deposición sea admisible de acuerdo con las Reglas de Evidencia de Puerto Rico, 2) que le haya notificado a la parte contraria que se llevaría a cabo una toma de deposición o que la referida parte hubiese estado presente o representada, y 3) que le demuestre al tribunal que le resulta oneroso lograr que el declarante comparezca al juicio en su fondo.

En el caso que nos ocupa, no existe controversia en cuanto a que los demandantes estuvieron presentes en la deposición que se le tomó al marinero Ronald Hale y de que éstos contrainterrogaron al referido declarante. Sin embargo y a pesar de lo dispuesto en la Regla 64(A)(5) de las de Evidencia, *supra*, los autos revelan que los demandados no presentaron prueba alguna que estableciera las diligencias que desplegaron para lograr que el marinero Hale compareciera a testificar al juicio. En su moción de reconsideración, lo más que hicieron fue indicar que realizaron gestiones telefónicas, pero ni siquiera presentaron ante el tribunal apelado las facturas del teléfono para acreditar la realización de las supuestas llamadas. En estas circunstancias, la determinación del tribunal de instancia considerando a Ronald Hale como un testigo que no estaba disponible, no constituyó un abuso de discreción. No erró al determinar que no se configuró una excepción a la regla que excluye toda prueba de referencia.

Como se ha mencionado, el hecho de que la deposición sea admisible conforme las Reglas de Evidencia, es sólo uno de los 3 requisitos que establece la Regla 29.1 de las de Procedimiento Civil, *supra*, para que una parte pueda utilizar en contra de la otra una deposición. En casos como el de autos, en el que se intenta utilizar la deposición de un declarante que se encuentra fuera de Puerto Rico, la parte que interesa utilizar la referida deposición, debe presentar prueba para demostrar que le resulta oneroso traer al declarante a testificar al juicio.

Los demandados, en todo momento han descansado en la alegación de que Ronald Hale vive fuera de Puerto Rico como si ello sólo fuera razón suficiente para que el tribunal aceptara la deposición que los demandados le tomaron al referido declarante. Más allá de indicar que realizaron varias llamadas telefónicas, no presentaron prueba alguna, ni siquiera argumento alguno, que le permitiera al tribunal apelado determinar que a ellos le hubiera resultado costoso o particularmente difícil lograr que Ronald Hale hubiera comparecido al juicio.

Sin embargo y además de lo que ya se ha mencionado, de la propia sentencia se desprende que el tribunal apelado estaba al tanto del testimonio vertido por Ronald Hale y que aunque no lo aceptó como evidencia, sí lo consideró y lo rechazó porque el mismo le resultaba de muy poca ayuda. ■ En consecuencia, no se cometió el error señalado.

**B. Si erró el tribunal de instancia al determinar que el furgón se volcó porque la carga se desplazó debido a la negligencia de los demandados**

El Tribunal Supremo de Puerto Rico estableció en *Eurípides Rodríguez Báez, etc. v. Nationwide Insurance Co.*, **2002 J.T.S. 61**, lo siguiente:

*"Es norma reiterada que en ausencia de error, prejuicio o parcialidad, este Tribunal no intervendrá con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad efectuadas por el tribunal de instancia. Trinidad García v. Chade, 2001 J.T.S. 10; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49 (1991). Esta norma busca evitar que las determinaciones de los tribunales de primera instancia sean sustituidas por las apreciaciones infundadas del foro apelativo.*

*En este sentido, hemos sido consistentes y firmes al resolver que los foros recurridos están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de ver y oír a los testigos declarar; por tal razón, su apreciación merece gran respeto y deferencia por el tribunal apelativo. En ausencia de pasión, prejuicio, parcialidad, error manifiesto, y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o que la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido. Pueblo v. Maisonave Rodríguez, supra*".

Tomando en consideración el pronunciamiento anterior, nos corresponde examinar la prueba que cada parte presentó para apoyar su versión particular sobre cómo ocurrió el accidente, en especial, como la carga fue estibada, para determinar si la conclusión del tribunal de instancia en cuanto a las causas que provocaron que el furgón se volcara es razonable, justa y está sustentada por la prueba presentada. Veamos.

### a. Prueba de los demandantes

Por la parte demandante testificaron Narváez, John Rivera Maldonado, Renzo José Román Torres, el Ingeniero Carlos R. Garrett, y Raymond Figueroa Alicea, un testigo de los demandados puesto a la disposición de los demandantes.

Según la transcripción de la evidencia, el codemandante Narváez testificó que el día del accidente estuvo trabajando desde las 7 de la mañana, y que luego de su hora de almuerzo regresó al terminal, se montó en el equipo (la mula) que le habían asignado en la mañana, salió a buscar uno de los furgones, lo enganchó, conectó las mangas y se dirigió al área donde se encontraba la barcaza. Señaló que la persona que estaba recibiendo los furgones le indicó que la barcaza estaba llena y que, por esta razón, hizo un viraje a la izquierda para estacionarse y buscar otro furgón. Expresó que puso la mula en reversa, que empezó a dar lentamente hacia atrás y que, cuando estaba haciendo la maniobra conocida como el siete (7), sintió un ruido proveniente del furgón. Indicó que como iba despacio (según él, a menos de dos millas) dejó que el tractor parara y que sintió que el mismo se levantó mientras el furgón permaneció en el suelo y que luego cayó.

En contrainterrogatorio aceptó que hizo dos virajes antes de llevar el furgón a estacionar y señaló que era probable que pudiera haber ido a 5 millas por hora. Negó que hubiese sentido ruido alguno mientras hacía los virajes o que hubiese notado algo raro y declaró que la maniobra del siete (7) la había hecho miles de veces sin que hubiera ocurrido accidente alguno. Explicó que los dos virajes los hizo a la izquierda, pero que como el espacio era grande, no tuvo necesidad de hacerlos de una forma violenta o brusca.

Indicó que mediante los topos se mantiene el furgón unido al chasis; pero que sin los topos en los pasadores se puede guiar en línea recta, hacer virajes y, si la carga está bien puesta y no se mueve, ir bastante ligerito y coger ciertas curvas. Señaló que cuando se iba a estacionar no tenía que guiar para el frente, que iba en reversa y bien lento, y que era mientras estaba haciendo el siete, y no cuando ya había terminado de hacer el mismo, cuando escuchó el ruido proveniente del furgón. Aseveró que no pegó freno porque él estaba casi "*parao*", y expresó que el camión no empezó a brincar violentamente, sino que empezó a levantarse. Indicó que ese día había mucha gente en el área, pero que no sabía si habían testigos oculares del accidente. Por último, señaló que la mula no se viró.

En el redirecto declaró que él no quitó, ni sabe si alguien quitó los topos; que el chasis de la mula se levantó por completo, y que no había necesidad de quitar los topos en ese momento porque ya habían indicado que la barcaza estaba llena.

A preguntas de la juez, señaló que los topos y los seguros se habían desprendidos, pero que el chasis se quedó pegado en el remolcador; que esa parte no se desprendió; que siempre estuvieron juntas y que lo que se

despegó fue el furgón. Señaló, además, que cuando se sueltan los topos es cuando la grúa que está en la barcaza va a levantar el furgón, y que entre sus tareas no estaba la de poner ni quitar los topos.

El testigo John Rivera Maldonado, quien para la fecha del accidente estaba a cargo de la seguridad de la compañía, declaró que la velocidad máxima a la que pueden ir los camiones dentro del terminal es a 5 millas por hora; que las fotos 6J y 6k mostraban cómo quedó la mercancía. Testificó, además, que nunca recibió quejas en cuanto a la forma en la cual Elpidio Narváez conducía; que a veces los empleados se enojaban con el demandante porque en situaciones en las que querían avanzar *"Elpidio estaba con su santa calma"*; y que el codemandante siempre era tomado como un ejemplo por sus supervisores.

En contrainterrogatorio aceptó que a su mejor entender los *"yard hustlers"* pueden desarrollar más de 5 millas por hora con un furgón enganchado, pero antes ya había aceptado que él no era ducho en cuestiones técnicas.

El testigo Renzo José Román Torres, Gerente de Operaciones de Inter Ship, fue aceptado como perito en cuanto a cómo cargar un furgón. ■ Señaló que la carga más pesada siempre tiene que ir en la base porque el punto de balance debe estar abajo y que cuando el furgón no está completamente lleno hay que nivelar la carga y fijarla con madera y palos transversales para evitar que ésta se mueva. Señaló que estaba presente cuando abrieron el furgón y que determinó que la carga había sido incorrectamente estibada porque no había seguridad ni protección a los lados del contenedor para evitar que ésta se moviera. Expresó que los pedazos de madera que aparecen en la foto tenían el propósito de evitar que la carga se moviera hacia atrás, y que de las fotos surgía que la carga estaba encima de las paletas, pero no amarrada a las mismas.

En contrainterrogatorio aceptó que las pailas estaban sobre las paletas y éstas sobre los drones, y que los pedazos de madera impidieron que la carga se moviera hacia atrás. Aceptó que la foto 4c fue tomada luego de que el furgón había sido enderezado, pero negó que hubiesen virado *"patas arriba"* al furgón porque lo enderezaron con una maquinaria especial. Declaró que podía darse el caso de que las pailas se viraran entre San Lorenzo y el puerto; que de ello haber ocurrido, también era posible que la pintura se hubiera chorreado; y aceptó que no había chorreo alguno de pintura en ningún sitio del *"yard"*. Estuvo de acuerdo con el abogado de los demandados que las pailas quedaron de pie, pero señaló que precisamente podía determinarse que el camión estaba mal cargado por la forma en la cual quedaron las mismas. Expresó que la carga no estaba aprisionada a los lados y que ello lo sabía porque se había metido al furgón para poder observar. ■ Aceptó que algunas pailas estaban aprisionadas y que no había espacio entre ellas. Declaró que no sabía la velocidad a la que iba Elpidio Narváez, pero indicó que el furgón no necesitaba ir a ninguna velocidad para virarse porque si la carga estaba mal estibada, éste podía volcarse. Finalmente, y a preguntas del abogado de los demandados, respondió que el furgón se volcó porque la carga se rodó.

En cuanto a las causas del vuelco del furgón, el perito de los demandantes, Ingeniero Carlos R. Garrett, expresó que la carga pesaba 50,692 libras; que la camada inferior pesaba 24,760 libras; la superior 26,554 libras, y que ello fue significativo porque para mantener la estabilidad de la carga tenía que haberse puesto la carga más pesada abajo y la más liviana arriba. Indicó que el furgón se volcó mientras Elpidio Narváez hacía la maniobra conocida como el siete (7) porque la carga no estaba debidamente riostrada y se corrió. Señaló que de las fotos podía observarse que el único riostraje que existía eran 2 piezas de madera colocada en forma de cruz; que esto sólo impedía que una porción, mas no la totalidad de la carga, se moviera dentro del furgón; y que no había riostraje de clase alguna que impidiese que la carga que estaba frente a las mencionadas piezas de madera se moviera hacia los lados. Aseveró que la carga no estaba amarrada, que tampoco estaba amarrada a las paletas, y que detrás se acomodó una cantidad de mercancía sin protección alguna. Explicó que la falta de riostraje adecuado, unido al hecho de que la carga más pesada estaba arriba y de que el furgón estaba en movimiento, provocó que la carga se desplazara, que le diera a la pared del furgón y que ocurriera el vuelco.

Por otra parte, indicó, que de acuerdo con la forma en la cual la carga fue colocada, buscó el centro de la gravedad del furgón y determinó que a un ángulo de 21.4 grados la base se saldría de la línea que va del centro de gravedad normal a la superficie de la tierra. Declaró que lo anterior significaba que el furgón tendría que moverse a un ángulo de 21.4 grados antes de convertirse en un objeto inestable y que habida cuenta de que el lugar donde ocurrió el vuelco era plano, el ángulo de inclinación no fue la causa del vuelco. En vista de todo lo anterior, concluyó que fue el desplazamiento de la carga la causa del vuelco y no otras razones.

En el contrainterrogatorio, el ingeniero Garrrett aceptó que el diagrama por medio del cual intentaba demostrar la forma en la que estaba la carga distribuida, no estaba a escala. Señaló que el hecho de que los topos estuvieran sueltos, no incidió en el accidente y que la causa del vuelco no fue la velocidad porque no existía modo alguno de que una mula en reversa pudiera alcanzar 15 ó 20 millas por hora. Explicó que la mula en reversa tiene sólo un cambio que le permite ir despacio, pero que llegar a 15 millas por hora era imposible. Por otra parte, y ante la pregunta de cómo era posible que la carga se hubiera desplazado si el demandante estaba guiando muy lento, el perito indicó que no existía la más leve evidencia que indicara que el proceso de desplazamiento de la carga no había comenzado en el trayecto de San Lorenzo al puerto, y que mientras el demandante hacía la maniobra del siete se llegó a una circunstancia en donde todo lo que se necesitaba era una pequeña fuerza para hacer que culminara el referido proceso.

Finalmente y como los demandados no lo utilizaron y lo pusieron a disposición de los demandantes, Raymond Figueroa Alicea testificó que trabajaba en Lanco; que guiaba un montacargas o *"finger"*; que en la deposición que se la había tomado aceptó que aparte del entrenamiento con el *"finger"*, no recibió otro entrenamiento en Lanco; que en cuanto a estibar la mercancía, lo hacía por la mucha experiencia que tenía; y que no recordaba haber bregado con el furgón accidentado. Sin embargo, señaló que él fue quien cargó el furgón en cuestión porque así se desprendía de un papel que él había firmado. Más tarde aceptó que no recordaba ese momento.

En contrainterrogatorio, explicó que luego que examinó la deposición vio un papel que él había firmado, y que entendió que aparentemente él había sido el que llenó el furgón. Señaló que con independencia de lo anterior, él siempre colocaba la mercancía más pesada abajo y la más liviana arriba; que los drones se amarraban con una cinta y no con cadenas; que había recibido muchos vagones y nunca había visto la mercancía amarrada con cadenas; y que cuando se terminaba de colocar la carga, se ponían paletas y 2x4 entre los canales.

En el redirecto, señaló que en la deposición expresó que no recordaba nada de lo que acababa de testificar; que no recordaba el número de drones ni de pailas, y que en el furgón había espacio libre.

**b. Prueba de los demandados**

Por los demandados declararon James Forsyth, Nelson Irizarry y el perito, Ingeniero José Rafael Capó.

El testigo James Forsyth declaró que para la fecha del accidente era jefe de operaciones de Sea Barge y que redactó el informe titulado *"Potential Loss Report"*. Declaró que no vio el accidente; que otras personas le describieron lo que pasó, y que no podía especificar si Ronald Hayes fue una de las personas a las cuales le preguntó con respecto a lo ocurrido el día de los hechos.

Nelson Irizarry testificó que trabajaba en Lanco desde el 1980 y que aprendió a empacar furgones observando la forma en la que la carga estaba estibada en los furgones que provenían de Estados Unidos. Señaló que toda la mercancía se monta en paletas de 36 x 42; que se forman camadas que se van colocando desde la parte de atrás del furgón hasta la puerta del mismo; que se colocan 2 paletas a lo ancho del furgón y sobre cada una de ellas 4 drones; sobre los drones, más paletas, y sobres éstas, la mercancía de la cual se trate. Luego de

observar las fotografías, señaló que encima de los drones se colocaron 2 paletas con pailas y que sobró un espacio a lo ancho del furgón. Expresó que cada una de las paletas fue pegada a cada uno de los lados del furgón y que el espacio que quedó entre ellas se rellenó con otras paletas vacías. Expresó que entre la última línea de drones y la puerta del furgón había un espacio de 4 paletas, que la última línea de drones no tenía paletas encima, y que detrás de la última tarima de pailas se colocaron paletas para asegurar que la carga no se desplazara. Aseveró que se acomodaron 4 paletas de pailas entre la última línea de drones y la puerta del furgón, y que ni las hormigas podían pasar, pues no había sobrado espacio alguno. Señaló que todas las pailas estaban amarradas a las paletas e indicó que por más de quince años Lanco ha estibado la carga en sus furgones utilizando este método y que nunca había ocurrido un accidente.

En contrainterrogatorio aceptó que se identificaba con Lanco; que nunca ha recibido entrenamiento formal para llenar un vagón; que en Lanco no hay ningún manual escrito relacionado con la estiba de furgones. Aceptó que era al *"finguero"* a quien le correspondía cargar el furgón, y que a pesar de que él era mecánico y no tenía ningún conocimiento en cuanto a cómo cargar un furgón, estaba presente porque el Sr. Diplán le pidió que le diera instrucciones al *"finguero"*. Aceptó que los drones no estaban amarrados a las paletas y que tampoco las paletas estaban amarradas con sogas o cadenas de un lado a otro del furgón. Aceptó que de acuerdo con la medida de las paletas, en el furgón cabían 20 de las mismas en 2 filas de diez; que aunque se colocaran las 20 paletas, de todas formas sobraba espacio, y que en el furgón accidentado sólo habían 16 paletas. Testificó que las 4 paletas con pailas se colocaron en el espacio que quedaba entre los drones y las puertas; que aún así sobraba un espacio adicional de 16 pulgadas, y que el mismo se llenó con paletas a la altura de las paletas que tenía las pailas que estaban en la parte posterior del segundo piso.

En el redirecto señaló que llevaba 20 años cargando furgones en Lanco y que nunca había visto que se amarraran las paletas con sogas o cadenas. Sin embargo, en el recontrainterrogatorio aceptó que el furgón no estaba completamente lleno, que en la parte de arriba había espacio, y que a pesar de que, según él, había cargado miles de vagones y de que no podía recordar la forma en cómo los había cargado a todos y cada uno de los mismos, se acordaba de cómo cargó el furgón accidentado porque había sido el único que había confrontado problemas.

Por último, los demandados presentaron como perito al ingeniero José Rafael Capó. Este concluyó que independientemente de si la carga se había desplazado, no había forma que ello hubiera provocado el vuelco del furgón. Señaló que de acuerdo con las medidas del furgón y la carga que allí se había colocado, sólo sobraba un espacio de 4 pulgadas; que para que la carga hubiese ocasionado el vuelco, la misma tenía que haberse comprimido y acomodado en una franja de 18 pulgadas; y que ello no ocurrió porque los drones salieron casi completos. Expresó que el informe del ingeniero Garrrett era estático y que de las deposiciones se desprendía que el accidente ocurrió cuando el camión estaba en movimiento. Explicó que el camión estaba haciendo un ángulo de 45 grados con el furgón y que la posibilidad de que se hubiese volcado a una velocidad de 2 ó 3 millas por hora era prácticamente nula. Expresó que de acuerdo con sus cálculos, Elpidio Narváez iba a una velocidad de 15 millas por hora. Señaló que a una velocidad de 16 millas por hora, un furgón está a punto de volcarse y que a 18 millas por hora tanto el furgón, el chasis y la carga están a punto de volcarse. Expresó, además, que si se lleva el camión hacia el frente a 18 millas por hora y a un ángulo de 45 grados, las fuerzas que tienden a volcar al camión son las mismas que actuarían sobre el referido camión si éste fuera a 18 millas por hora, a 45 grados y en reversa. Por último, indicó que en su opinión el furgón no tenía los topos puestos.

Durante el contrainterrogatorio, el ingeniero Capó admitió que su informe estaba incorrectamente ilustrado; que cuando señaló que el furgón podía volcarse en línea recta se refería al caso en que los topos estuvieran sueltos; y que cuando los topos están sueltos, sólo desaparece su acción y no los topos mismos porque aunque sin ajustar, éstos permanecen dentro de la canal. Expresó, además, que un furgón en una maniobra entre 45 y 90 grados, se viraría a una velocidad de 15 millas por hora, pero sólo con la carga correctamente distribuida. Admitió que la versión que presumió como correcta en cuanto a cómo sucedieron los hechos, fue la dada por el

marinero Ronald Hale y no la de Elpidio Narváez, y que para determinar la velocidad necesaria para que se produjera el vuelco, presumió que en la curva entre el tractor y el furgón había un ángulo de 45 grados. A su vez, indicó que asumió que la carga no se había movido porque Roberto Rodríguez Luna, chofer que transportó la carga hasta el puerto, señaló que no notó nada anormal en el viaje. Aceptó que nadie podía certificar que la carga no se había movido porque nadie abrió las puertas del furgón; que erró cuando señaló que el demandante se había detenido en el lugar donde sueltan los topos y que había abandonado el tractor por un rato; y que no tenía evidencia de testigo alguno que le haya dicho que después que Rodríguez Luna trajo el furgón, alguien soltó los topos. Señaló que estuvo de acuerdo con la determinación que en cuanto al peso de la carga estableció el ingeniero Garrett; con el cálculo que éste hizo en cuanto a cuál era el centro de la gravedad; con la distribución de la carga que aparece en el informe del ingeniero Garrett; con el anejo 3 del informe que ilustra cómo la carga estaba distribuida; con el hecho de que la carga de arriba era más pesada que la de abajo, con la conclusión de que ello aumenta las posibilidades de un vuelco y con aquélla que explica que mientras más alto sea el peso que se coloca arriba, más alta es la propensión al vuelco; con el hecho de que el camión no iba totalmente lleno; que había un área que no estaba llena de mercancía; que la carga podía desplazarse, [5] y con la conclusión de que el furgón no se volcó por la inclinación del suelo. Por otro lado, expresó que no tomó en consideración las medidas de las paletas y tuvo que aceptar que dado que el ancho del furgón mide 96 pulgadas, y las paletas 36 x 42, si las mismas se colocaban a lo ancho, es decir, cada una por el lado que mide 42 pulgadas, hubiera sobrado un espacio de 12 pulgadas.

En el re-directo expuso que aunque no contó con testigos que le informaran que los topos habían sido soltados, lo pudo inferir de las fotos que tuvo ante sí porque no había ninguna deformación en las esquinas del furgón y que ello indicaba que no salió ninguna pieza forzada como hubiera ocurrido si hubieran estado los topos anclados. Señaló, además, que si el chasis hubiera estado agarrado por los topos, se habría volcado, o que la esquina donde estaban los topos se habría destrozado. Aseveró que existía un espacio en el segundo piso y que aunque asumió que había un desplazamiento hacia los lados como hacia atrás del furgón, ello sólo podría haber pasado si la carga no hubiese estado debidamente asegurada. Indicó que no sabía si el camión estaba diseñado para moverse en reversa a 18 millas por hora con un furgón cargado con más de cincuenta mil libras, pero que estimaba que no podía. Señaló que aunque la mercancía se hubiera desplazado en el trayecto de San Lorenzo al puerto, el furgón, por lo menos en estática, no se habría volcado. Por último, indicó que el desplazamiento de la carga sólo hubiera provocado un cambio en el centro de la gravedad, pero que en el caso que nos ocupa, no podía cambiar mucho porque él estimaba que el furgón estaba bastante lleno.

## c. Análisis de la prueba

Evaluada la anterior prueba, debemos concluir que el tribunal de instancia recibió evidencia proponderante suficiente para concluir que la causa de que el furgón se volcara fue el desplazamiento de la carga que los empleados de Lanco colocaron negligentemente en el furgón. Tal determinación no es irracional o imposible. Adjudicada la credibilidad que le mereció al tribunal de instancia, no puede decirse que no constituye el balance más racional y justiciero de la prueba.

Como puede verse, lejos de lo alegado por los demandados en cuanto a que habían presentado abundante prueba para demostrar la forma en la cual habían distribuido la carga; el testimonio más favorable a los demandados consistió del que virtió una persona que admitió que no vio el accidente ni como había quedado el furgón y que lo que sabía se lo habían informado otras personas a las que no podía identificar. A su vez, consistió de un segundo testigo que aceptó que no recordaba si había estibado la carga en el furgón accidentado, y el de un tercer declarante que testificó que para la fecha de los hechos se desempeñaba como mecánico, no tenía asignada la tarea de cargar los furgones, y aún más, que no estaba capacitado para estibar los furgones.

Frente a lo declarado por estas tres personas, los demandantes presentaron a un perito en ingeniería mecánica que elaboró un detallado diagrama para ilustrar la forma en la que los demandados distribuyeron la

carga, ■ y el de un segundo perito en estibar furgones que indicó que estuvo presente cuando abrieron el furgón siniestrado, que entró al furgón, que pudo constatar la forma en la que quedó la mercancía y que en su opinión pericial concluyó que los demandados habían distribuido y estibado la carga erróneamente y sin un riostraje suficiente que impidiera que la misma se moviera hacia cada lado del furgón.

Así pues, las determinaciones de hechos formuladas por el tribunal *a quo* en cuanto a que la carga había sido incorrectamente estibada, encuentran total apoyo en la prueba presentada por las partes y que creyera el tribunal.

Por otra parte, y en cuanto a cuáles fueron las causas del vuelco, el perito de los demandantes opinó que la carga estaba mal estibada, que ésta se desplazó mientras el demandante Narváez realizaba la maniobra del siete y que cuando ocurrió el desplazamiento, la carga azotó las paredes del furgón y causó el vuelco. Es esta opinión pericial la que a juicio del tribunal de instancia y a nuestro entender explica mejor las causas del accidente. Más allá de una opinión, la misma se fundamenta en hechos y datos que hasta los demandados aceptaron como correctos, entre estos: que la carga más pesada fue colocada sobre la carga más liviana; que ello aumentó la inestabilidad del furgón y, por ende, las posibilidades de que el mismo se volcara; que las pailas que iban sobre los drones no fueron amarradas a las paletas; que sobraba espacio tanto a lo ancho como a lo largo del furgón; que la carga podía desplazarse y que el accidente no podía ocurrir por la inclinación del terreno.

De otra parte, el perito de los demandados sostiene que el que el furgón se volcara ocurrió porque el codemandante Batista guiaba la mula a una velocidad exagerada. No obstante y habida cuenta que el perito de los demandados fue impugnado, esta teoría no fue creída por el tribunal de instancia, pues no tomó en cuenta, parte de los hechos que quedaron probados en este caso.

En primer lugar, la opinión pericial que brindó el Ingeniero Capó se fundamenta en el testimonio que en su día emitió el marinero Ronald Hale y que coloca al demandante guiando hacia el frente y a un ángulo de 45 grados. No obstante, no brindó una opinión alterna en cuanto a cuál sería la situación en caso de que los hechos hubiesen ocurrido como indicó el demandante y como lo determinó el tribunal apelado: que el demandante iba en retroceso y a 90 grados, pues estaba haciendo la maniobra del siete.

Además, el Ingeniero Capó admitió que al evaluar la información para determinar la velocidad a la que el codemandante Nazario guiaba la mula, tomó en consideración que entre la curva, el tractor y el furgón había un ángulo de 45 grados, lo cual no encuentra apoyo en la prueba presentada por las partes. Aceptó que al determinar la velocidad a la que debía ir el codemandante Narváez para que el furgón se virara, sólo consideró que la carga estaba correctamente colocada en el furgón, y no analizó ni determinó la velocidad a la cual el furgón se viraría si la carga hubiese estado incorrectamente estibada y sin riostraje suficiente que impidiera su desplazamiento. ■

Finalmente, ni el ingeniero Capó ■ ni los restantes testigos de los demandados cuestionaron o impugnaron el testimonio del Ingeniero Garrett en cuanto a que para retroceder, la mula sólo tiene un cambio de velocidad y que, por ello, resultaría imposible que la misma hubiese alcanzado la velocidad de 18 millas a la cual y, de acuerdo con el perito Capó, hubiera tenido que conducir Narváez para que tanto el furgón, la carga y la mula se viraran.

Sabido es que este Tribunal puede adoptar su propio criterio en la evaluación y apreciación de la prueba pericial y que, inclusive, puede descartar la misma aunque resulte técnicamente correcta. *Dye-Tex Puerto Rico v. Royal Insurance*, **2000 J.T.S. 67.** No obstante, en el caso de autos resulta innecesario hacer uso de esa discreción, porque al igual que el tribunal apelado, entendemos que la prueba presentada por las partes demuestra que lo que causó el vuelco del furgón fue el desplazamiento de la carga dentro del furgón, pues fue negligentemente acomodada. Lo anterior, además de estar sustentado por la prueba, resulta razonable,

físicamente posible y convincente. En consecuencia, no se cometió el error señalado.

## III
### A. Si erró el tribunal de instancia al evaluar los daños

En cuanto al planteamiento esgrimido por los demandantes en torno a la valoración de los daños, el Tribunal Supremo de Puerto Rico ha señalado en innumerables ocasiones que la gestión judicial de estimar y valorar los daños en casos como el de autos, es difícil y angustiosa, porque no existe un sistema de certera computación que permita llegar a un resultado exacto con el cual todas las partes queden satisfechas y complacidas. *Marta Nieves Cruz v. UPR*, **2000 J.T.S. 91**.

En vista de ello, se ha establecido que la valoración de los daños descansa en la sana discreción del juzgador, *Torres Solís et al v. A.E.E. et als.* 136 D.P.R. 302 (1994); *Ruiz Guardiola v. Sears Roebuck,* 100 D.P.R. 817 (1972), y que la determinación a la cual lleguen los tribunales de instancia con respecto a las cuantías indemnizatorias merecen gran deferencia por parte de este Tribunal. *Colón v. Municipio de Guayama*, 114 D.P.R. 193 (1982); *Maldonado v. Interamericana University,* 104 D.P.R. 420 (1975).

Por ello, es principio reiterado que este tribunal no intervendrá con la estimación que en cuanto a los daños realicen los tribunales de instancia, a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Marta Nieves Cruz v. UPR, supra.*

En el caso que nos ocupa, el tribunal apelado le concedió al co-demandante Narváez una indemnización total de $140,000.00 que desglosó de la siguiente forma: $70,000.00 por las fracturas, golpes, heridas, contusiones, hospitalización, operaciones, complicaciones médicas y dolores y angustias que sufrió debido a los tratamientos de los que fue objeto; $40,000.00 por todos los dolores e inconvenientes durante sus sesiones de terapias, su convalecencia en silla de ruedas, su reclusión prolongada en el hogar, su uso del andador, muletas y luego bastón; y $30,000.00 por su incapacidad física y por su inhabilidad de llevar a cabo las actividades físicas que antes realizaba.

Como ya indicáramos, los demandantes sostienen que la cuantía concedida resulta ser sumamente baja cuando se compara con las concedidas por el Tribunal Supremo de Puerto Rico en casos similares al que nos ocupa.

Cierto es que, de acuerdo con el Alto Foro, no hay dos casos exactamente iguales, que cada caso se distingue por sus propias y variadas circunstancias y que por ello, a pesar de que resulta aconsejable que los tribunales de instancia utilicen como guía o punto de partida las cuantías concedidas por el Tribunal Supremo en casos similares, la decisión que se emita en un caso en específico con relación a esta materia, no puede ser considerada como precedente obligatorio para otro caso. *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996)

No obstante, cuando comparamos las circunstancias del caso que nos ocupa con aquéllas que movieron al Tribunal Supremo de Puerto Rico a conceder determinada indemnización en casos similares, nos convencemos que la indemnización que le fuera otorgada al codemandante Narváez debe ser aumentada.

En *Quiñones López v. Manzano Pozas, supra,* el Tribunal Supremo de Puerto Rico confirmó la determinación del tribunal de primera instancia que le concedió al demandante una indemnización ascendente a $150,000.00. En ese caso, y de acuerdo con el Tribunal Supremo, el tribunal de primera instancia concluyó como cuestión de hecho que López Quiñones, que para aquel entonces tenía 50 años de edad, *"perdió el conocimiento al ser impactado por un automóvil, sufrió una fractura conminuta desplazada subtrocantérica del fémur debajo del trocante menor del lado izquierdo de la pierna, fue intervenido quirúrgicamente en el*

*subtrocanter y se le puso una placa de metal que le fue fijada con nueve tornillos, fue intervenido quirúrgicamente, por segunda ocasión, removiéndole los tornillos que sujetaban la placa de metal e insertándole un "Zickel Nail" de trece milímetros por la punta del trocanter, tardó seis meses en sanar de la segunda intervención, teniendo que utilizar muletas para movilizarse, sufriendo posteriormente una atrofia de los músculos quedando algo de debilidad en la extremidad sin que pueda recuperar su fuerza original, se afectó tanto en su vida familiar como profesional."*

En el caso que nos ocupa, el demandante sufrió no una, sino 9 fracturas diferentes; golpes y contusiones en diversas partes de su cuerpo; profundas y extensas heridas en la región frontal que le han dejado cicatrices visibles en su rostro, y cuatro operaciones distintas, mediante las cuales le introdujeron placas y tornillos que tendrá que utilizar permanentemente. Además, recibió más de 100 sesiones de terapias y tuvo que utilizar, por un prolongado período de tiempo, un sillón de ruedas, un andador y un par de muletas. Por el resto de su vida tendrá que utilizar un bastón y unos zapatos especiales para contrarrestar el acortamiento de su pierna izquierda. Finalmente, el demandante no puede realizar las actividades deportivas y recreativas que antes llevaba a cabo, y ha visto perjudicada tanto su vida personal, matrimonial como su vida profesional.

Tomando el caso de *Quiñones López* como punto de referencia y en vista de lo anterior, este Tribunal entiende que la cuantía que el tribunal *a quo* le concedió al codemandante Narváez, no indemniza razonablemente la totalidad de los daños y perjuicio que el referido demandante sufrió. En consecuencia, la indemnización total de $140,000.00 otorgada a éste por todos sus sufrimientos físicos y morales como consecuencia del accidente, se modifica y aumenta a $200,000.00.

Finalmente y en cuanto a la indemnización que el tribunal apelado le concedió a los restantes codemandantes, resolvemos que las referidas cuantías no resultan ridículamente bajas, por lo que no intervendremos con la valorización del tribunal de instancia.

**B. Si erró al determinar que los demandados habían sido temerarios.**

En cuanto a la procedencia de honorarios de abogado por temeridad, la Regla 44.1(d) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1(d), dispone lo siguiente:

*"[e]n caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda que correspondan a tal conducta."*

La referida imposición de honorarios tiene el propósito de penalizar al litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente a asumir las molestias, gastos, trabajo e inconvenientes de un pleito. *Oficina de Etica Gubernamental v. Julio Román González*, **2003 J.T.S. 106**.

Así, se entiende que una parte ha sido temeraria cuando ésta ha obligado a la otra u otras partes a incurrir en gastos innecesarios al interponer pleitos frívolos, o alargar innecesariamente aquellos ya presentados ante la consideración de los tribunales, o que provoque que incurra o incurran en gestiones evitables. *María Domínguez Vargas v. Great American Life etc*, **2002 J.T.S. 110**.

Existirá temeridad cuando: (1) en la contestación a la demanda se niegue responsabilidad, pero ésta se acepte posteriormente; (2) la parte demandada se defienda injustificadamente de la acción; (3) se crea que la cantidad reclamada es exagerada y esa sea la única razón para oponerse a los reclamos del demandante y no admitir responsabilidad, pudiendo limitar la controversia a la fijación de la cantidad reclamada; (4) el demandado se arriesgue a litigar un caso del que surja a todas luces su responsabilidad; y (5) cuando se niegue

un hecho cuya certeza le consta a quien hace la alegación [citas omitidas]. El grado o intensidad de la conducta temeraria o frívola es el factor determinante para fijar la cuantía de los honorarios de abogado. *Oficina de Etica Gubernamental v. Julio Román González, supra.*

En el caso de autos, el tribunal apelado le ordenó a los demandados pagar la suma de $1,000.00 por concepto de honorarios de abogado. Hemos revisado el expediente en su totalidad y leído cuidadosamente la transcripción del juicio en su fondo y no surge de ello fundamento alguno que nos permita concluir que los demandados procedieron con temeridad en la tramitación de su caso. Los demandados descansaron en la opinión pericial del ingeniero Capó que señalaba como la causa del vuelco la velocidad a la que supuestamente guiaba la mula el codemandante Narváez. Tomando esto en consideración, y el hecho de que, en última instancia, para que el tribunal *a quo* pudiera determinar las causas del vuelco del furgón accidentado, era de vital importancia el testimonio pericial que presentaron las partes, no podemos sino señalar que los demandados se defendieron justificadamente, y que la posición que asumieron no estaba desprovista de fundamentos. Por tanto, y en vista de lo anterior, no debió el tribunal apelado ordenarle a los demandados pagar suma alguna por concepto de honorarios de abogados por temeridad. En consecuencia, se cometió el error señalado.

## IV

Por los fundamentos anteriores, se modifica la sentencia apelada para aumentar a $200,000.00 la indemnización que le fue concedida al codemandante Elpidio Narváez Villanueva por sus sufrimientos físicos y morales, y dejar sin efecto el pago de honorarios de abogado por temeridad. Así modificada, se confirma.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2004 DTA 74

**1.** Conforme la Regla 804 (a) (5) Federal, al declarante se tiene por no disponible si *"is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivisions (b)(2), (3) or (4) the declarant's attendance or testimony) by process or other reasonable means"*.

**2.** En lo pertinente, el Tribunal *a quo*, señaló lo siguiente:

*"Durante el juicio, la parte demandada no presentó prueba sobre las alegaciones en cuanto a exceso de velocidad, excepto deposición del Sr. Ronald Hale, quien no vino a declarar y cuya deposición fue objetada correctamente por la parte demandante por no haberse acreditado la imposibilidad de este testigo a comparecer, ni las gestiones realizadas para lograr su comparecencia. No obstante, aun cuando hubiéramos admitido la deposición del Sr. Hale, en sustitución de su testimonio se desprende que él no podía declarar sobre a qué velocidad iba el camión y meramente expresó su opinión, contra la objeción del abogado de la parte demandante, de que el tractor se movía "muy rápido", opinión éste sobre la causa del accidente que es inadmisible. Por otro lado, admitió no saber a qué velocidad pueden marchar esos tractores y que su estimado sobre la velocidad era especulativo. Tampoco sabía el peso del furgón ni de la carga, ni si ésta se desplazó o no dentro del furgón. De muy poca ayuda para el Tribunal resulta ese testimonio en deposición, aunque fuera admisible."*

**3.** Los demandados, no obstante, se opusieron a que este perito pudiera emitir una opinión en cuanto a qué fue lo que causó el vuelco del furgón.

**4.** A preguntas del abogado de los demandados, respondió que por primera vez indicaba que se había metido al furgón porque era la primera vez que se lo preguntaban en el juicio. Que como en el directo no se le preguntó, nada mencionó al respecto.

34

**5.** El testigo declaró lo siguiente. *"aunque ello cuando yo vi que se podían desplazar... no quiere decir que se podían desplazar en el camino, es que físicamente lo más grave que puede ocurrir es que de alguna manera o se movieran hacia allá o que alguien la moviera hacia allá."*

El testigo intenta cualificar su declaración aduciendo que quería ver si en el peor de los casos la carga podía desplazarse al punto de provocar el vuelco, cosa que niega. No obstante, el testigo intenta minimizar el hecho de que la razón por la cual se planteó el problema, lo fue porque, en efecto, determinó que la carga podía desplazarse.

**6.** El referido diagrama fue aceptado como correcto por el perito de los demandados.

**7.** Debe recordarse, además, que de acuerdo con el Ingeniero Capó en el caso en que la carga no hubiera estado correctamente estibada y con suficiente riostraje, la misma se hubiese podido desplazar tanto hacia los lados como hacia el frente durante el trayecto que el furgón recorrió entre San Lorenzo y el puerto.

**8.** Según lo estimado por el ingeniero Capó la mula no podía desarrollar una velocidad de 18 millas por hora cuando esta en reversa.